RICHMOND *v.* RICHMOND.

(*Nashville,* December Term, 1949.)

Opinion filed February 10, 1950.

H. B. McGinness and J. B. Gore, both of Carthage, for plaintiff in error.

Russell Wright and James Donoho, both of Hartsville, for defendant in error.

Mr. Albert Williams, Special Justice, (sitting for Mr. Justice Gailor) delivered the opinion of the Court.

This record presents a will contest filed by a son, Wiseman Richmond, to avoid the joint will of his mother, Darthulia M. Richmond, and his father, T. W. Richmond. The cause was heard below by the circuit judge sitting without a jury. He held for the will, and on appeal the Court of Appeals affirmed that judgment. We granted *certiorari* and brought the case here for disposition.

The assignments of error present no issue of disputed fact nor is there any serious difficulty in understanding what the testators intended to do. In our view the question is one of law, namely whether the plan pursued by the testators in appointing their property is a permitted method of testamentary disposition.

The paper offered for probate is as follows:

"Know all men by these presence that we, T. W. Richmond and wife, Darthulia M. Richmond, being of sound mind do this day make and publish our last will and testament.

"1st. After our death we desire that our funeral expense be paid as soon as possible together with any other indebtedness we may owe at our death.

"2nd. It is our will that each of our children share equally in our property alike when both of us are dead and buried, and that a nice double monument be erected to our graves when both of us are laid away, not too costly say $150.00, or there about, by our executor to be set out and named later.

"We have along and along paid out lots of money to some of our children and we feel like it will be right for them to be charged up of any advancement thats been made to them heretofore.

"3rd. We are agreed to nominate Norman Richmond, our youngest son, our executor to this will and empower him to sell all our property both real and personal at our death and make deed to purchaser of our lands. We desire that the land be sold for one third cash, balance one and two years with note and approved security interest bearing notes. As to personal property if one of us should die our desire is to sell all of that the one left will not need, such as stock, tools or such household not needed by the one that is left.

"The executor shall make a reasonable bond for his faithful service as to money going in his hands and he is to make prorates to brothers and sisters as the money accumulates in his hands along and along.

"4th. The executor to have the entire use of all the lands left by us rent free except the insurance and taxes. Should either one of us die the other is to be cared for as a father or mother should be treated with all kindness that a son or daughter that are due to treat father or mother and he is to keep the lands in as high state of cultivation as possible and the buildings and fence in good repair. Should he falter of duty that is in reason he relenkis (sic) his rights as executor and moves off and let another be qualified to fill his place.

"5th. When we are both dead and buried, the executor is to advertise all the lands we died in possession of in four or five places in Trousdale County, also in county papers as to date of sale and also sell balance of personal property to highest bidder. Personal to be sold

under $5.00 cash, balance note with two good securities six month credit and when everything is sold he will pay to his brothers and sisters equally less the amounts advanced by us to them as follows: Kate Gregory Richmond $406.34, Wiseman Richmond $1866.00, Norman Richmond $784.50, Budie Richmond, $6450.07. At the death of Darthulia M. Richmond the life policy No. 156327 in Phoenix Life Insurance Company is to be collected by the executor and divided equally to the heirs that are entitled to the division or any money might be left by either of us at our death. The said Norman Richmond executor at the death of either of us is to move in our home and care for the one that is left until his or her death and is to use our land rent free stated and carried out as to above. This August 7th, 1942.

"T. W. Richmond
"D. M. Richmond."

It was stipulated that upon the death of Mrs. D. M. Richmond on August 21, 1942, the plaintiff Norman Richmond probated the paper writing here in contest in common form as the will of Mrs. Richmond and that upon the death of T. W. Richmond on February 11, 1949, the same paper writing was offered for probate as the will. The contest was then instituted.

It was further stipulated that the testators, prior to the time of the death of Mrs. Richmond, had separate and individual bank accounts and no joint account. At the time of the death of Mrs. Richmond her bank balance was about $1055.66 and that of her husband about $2,000. At the time of his death he had on deposit to his individual credit the sum of about $4,000. Mrs. Richmond owned individually a tract of land of about fifty acres and her husband owned two tracts of land amounting to about

one hundred twelve acres. Sixty additional acres were held by entireties. At the time of their respective deaths Mrs. Richmond was seventy-six years of age and Mr. Richmond eighty-eight. Eight children survived the parents.

Joint wills, as the term is now generally understood, 69 C. J., Wills, p. 1295, are recognized in Tennessee. *Popejoy* v. *Peters,* 173 Tenn. 484, 121 S. W. 2d 538; *Seat* v. *Seat,* 172 Tenn. 618, 113 S. W. 2d 751; *Epperson* v. *White,* 156 Tenn. 155, 299 S. W. 812, 57 A.L.R. 601. In fact, the division that was long thought to exist among the authorities upon the validity of such instruments appears to have derived largely from semantic difficulties. Thus, when Sir Edward Williams asserted that in the very nature of things there could not be a conjoint will, Williams on Executors, 7th Amer. Ed., pp. 9-10, he was employing the word "joint" in the narrow and technical sense common in the law of contractual obligations but which conventionally now does not follow over into the law of wills. Where it is considered that the characteristic quality of a joint instrument prevents its revocation without the concurrence of the joint makers, courts have sometimes accepted the dictum that because a will "cannot be the will of more than one person, it cannot be joint." Rood on Wills, par. 70. It is worth noting that the same textwriter whose sweeping assertion is here quoted proceeds immediately to say, "There is no reason why several persons may not execute the same paper as expressing the dispositions of their property, which they desire to have made after their deaths, whether the property thus disposed of by them be owned by them severally or in common, and such wills should be and generally have been sustained—not as the joint will of all, but as

the several will of each." Instructive history appears in the North Carolina decisions where the Supreme Court, having early held against the validity of joint wills, *Clayton* v. *Liverman,* 19 N. C. 558, 2 Dev. & Bat. at page 558, returned to the subject many years later and expressly adopted the dissenting opinion in the earlier case which had been prepared by Judge Daniels. In re Davis' Will, 120 N. C. 9, 26 S. E. 636, 38 L.R.A. 289, 58 Am. St. Rep. 771.

■ Our Tennessee cases have made it plain that the term, as employed in this state, means no more than a plurality of wills appearing in the same instrument. Of course it must not appear on the face of the paper that to give it effect as the sole will of any testator would be contrary to his intention, or that it is impossible to ascertain how he would have it operate as his sole will.

■ The litigants in this case are apparently in accord on this primary principle. They seem to be further in agreement upon the important rule made plain in the case of *Epperson* v. *White, supra,* that no will, joint or single, can be allowed to postpone the vestiture of titles to a date subsequent to the death of the testator or to provide for such vestiture prior thereto.

What is earnestly debated is whether the will in the present instance can be treated as two individual wills, independently operative, or whether it must be said that under the terms of the document, treated as two wills, neither was subject to full execution prior to the effective date of the other.

■ If the testators meant to treat their several estates separately and nothing appears to prevent the execution of the paper writing as the single will of either of the testators upon his or her death, there can be no objection

to sustaining the validity of the joint instrument. *Pope-joy* v. *Peters, supra.* If, on the other hand, it is apparent that the testators meant to treat their estates as a joint possession to be disposed of and vest in their beneficiaries only when both wills become operative, so that the administration of one estate would have to abide the settlement of the two estates, the direction as to advancements would hypothesis of an intervening trust, to bring the directions of the testators within the limits beyond which wills are not permitted to be made.

 In considering the application of these rules to the case at hand, we think the clearly expressed intention of the testators was to hold in abeyance the estate of the spouse first dying until the death of the other. ''It is our will'' that ''our property'' be shared equally by our children ''when both of us are dead and buried'' and that a monument be erected ''when both of us are laid away.'' Again: ''As to our personal property if one of us should die our desire to sell all of that the one left will not need.'' Thus, what was needed by the survivor was to remain unsold until his death. Observe also the provision that, ''when we are both dead and buried the executor is to advertise all the lands we died in possession of in four or five places in Trousdale County, and also in county papers as to date of sale and also sell balance of personal property to highest bidder.'' Can such expressions as those quoted leave any doubt that the separate estates were intended to be joined by the death of the last surviving spouse?

 But even if the above given quotations were not revelatory of the purpose to require a joint administration of the other, there would be no way, even through the preclude any other interpretation. Although the Court

of Appeals in its opinion noted the existence of this provision, a discussion of its evidentiary aid in determining the purpose of the testators and the possibility of its accomplishment except by joint administration, was pretermitted. Each of the several advancements recited by the testators appears to be the sum of the advancements made by the testators to the particular beneficiary and there is no indication whatever that any part of any of the several advancements are to be taken into account in the administration of either of the separate estates. On the contrary, they appear to be charged against the shares in the estate of the testators considered as a common fund. It is clear that the testators expected the advancements to be so treated and not to be collated and brought into contribution in the distribution of the separate estates administered singly.

The proponents of the will take note of the difficulty resulting from the provision concerning advancements but think it may be solved by an interpretation which would cause the will to direct that the advancements be regarded as a part of the estate of the testator who died first ''to be collected out of the money or any life insurance at the death of the first testator, and the balance out of the land and other personal property at the death of the survivor.'' We cannot find in the will a justification of this assumption of intent. On the contrary, the section concerning advancements is altogether consistent with the purpose, otherwise shown, to treat the two estates as a common fund, and but adds force to the conclusion that the testators did not design that the wills should operate independently.

We have concerned ourselves with the suggestion made by Mr. Page, that to save joint wills which postpone the

operation of the instrument "the intention of the party . . . to make the gifts therein set forth should be regarded as his primary intent, and his intention to postpone the operation of the instrument until the death of the survivor should be regarded as a subsidiary intent which should be ignored as contrary to and inconsistent with the paramount intent." Page on Wills, Section 108, but find that such reasoning leads us into outright conflict with established authority. *Epperson* v. *White, supra.* Also, like the construction which would accept the hypothesis of a trust to accomplish vestiture of title, this response would still beg the vital and determinative question of whether a court, in the present case, can order the will executed in a manner permissible under the law without thereby substituting for the expressed will of the testators, a wholly different plan and purpose.

The validity of wills is often saved by looking through the artificiality of technical terms to reach the real meaning of the testator. But by the same token the real meaning of a testator may shine through the rules of conventional construction to destroy the validity of a will, if the purpose appears to be one that the law does not permit to be effectuated. In this case there is a concurrence of so many separate evidences of the intention to treat the two estates as one that the implication cannot be considered fortuitous. It was not only contemplated but intended by the testators that the administration of their estates should be interdependent. Therefore, for the reasons above given, the judgment of the trial court and the Court of Appeals is here reversed. Judgment will be entered accordingly and the cause remanded to the Circuit Court for orders consistent therewith.

All concur.